John ARENS and Richard Alexander *v.* The
COMMITTEE ON PROFESSIONAL CONDUCT of the
Supreme Court of Arkansas

91-80                                          820 S.W.2d 263

Supreme Court of Arkansas
Opinion delivered November 25, 1991
[Rehearing denied December 23, 1991.]

*Arens & Alexander*, by: *Lynn D. Lisk*, for appellants.

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, by: *John S. Cherry, Jr.*, for appellee.

ROBERT H. DUDLEY, Justice. The Committee on Professional Conduct issued letters of caution as a sanction against John Arens and Richard Alexander, law partners, for charging a fee that was not "reasonably commensurate with the circumstances" and, after termination of their employment, failing to "take steps to the extent reasonably practicable to protect the client's interests." They jointly appeal the entry of their separate sanctions on the committee's records. We affirm the committee's actions.

Leon and Marcie Stoppel were the operators of a farming business, involving about 7,000 acres, near Oakley, Kansas. They owed $1,000,000 to the Production Credit Association and almost another $1,000,000 to the Federal Land Bank, and were having trouble paying their loans. They had been through Chapters 11 and 12 federal bankruptcy actions, and the Production Credit Association and the Federal Land Bank had filed foreclosure actions against them.

In January of 1988, Leon Stoppel read an article about John Arens' abilities as a lawyer in the field of agricultural loans and lenders' liability. Later, while Arens was in Wichita, Kansas, to speak at a seminar on legal matters relating to agriculture, Stoppel phoned him. Although the Stoppels had a lawyer in Kansas, Leon Stoppel thought that they needed the services of a specialist in the field of lenders' liability for agricultural loans. In April of 1988, he went to Fayetteville to visit Arens and inquire further about his services.

On July 5, 1988, with the foreclosure sale of their farm only weeks away, Stoppel and his wife employed the law firm of Arens and Alexander. According to Stoppel, the law firm was to try to get their loans restructured and then to immediately file and fully pursue their lenders' liability claims against the Production Credit Association and the Federal Land Bank. That understanding is verified by the contract of employment which provides: "My wife and I wish to retain you and your firm to represent us in a lawsuit (if necessary) with the Farm Credit System to enforce our rights under the Agricultural Credit Act of 1987 and to obtain damages caused by the Farm Credit System."

At the time of employment, the Stoppels paid a retainer of $60,000 to the law firm. Under the terms of the written contract the retainer was non-refundable. In addition to the retainer paid that day, the Stoppels agreed to pay an additional amount upon the following contingency:

> It is our understanding that if any recovery is made over and above debt restructure or reduction, that our expenses, including the above retainer, and your firm's out-of-pocket expenses, will be paid. Only thereafter will any net recovery be shared on a sixty percent (60%) to us and forty percent (40%) to your firm basis.

Rule 1.5 states that a lawyer's fee shall be reasonable. It additionally provides the criteria to be used in determining reasonableness in a case: the time and labor anticipated, the novelty and difficulty of the questions involved, the skill required to perform the anticipated services, the extent to which this case would exclude other employment, the customary fee for specialists, the amount of money involved, the time limitations imposed by the clients, the length of the relationship with the client, and the experience and reputations of the lawyers.

The fact that a fee may be high does not alone make the fee unreasonable. Here, the Stoppels were faced with the imminent sale of their farm and equipment. Time was of the essence. The amounts involved in the foreclosure sale and the anticipated lenders' liability suits were large. The primary law involved, the Farm Credit Act of 1987, was new. The issues were complex. These (2) two attorneys devoted almost all of their time to this particular type of practice. The Stoppels were debtors facing

forced collection of the money they owed, and the lawyers cannot be faulted for collecting their fee in full while it was still possible to do so. In addition, we cannot ignore the thought by many attorneys that a part of the supposed strategy of a large lender is to wear down and financially exhaust a debtor and his lawyer. Under this type of fee agreement, a case could be completed.

■ In sum, while the fee was high, it was not, by itself, unreasonable when consideration is given to all of the services which were to be performed by the attorneys. However, the amount of a retainer is not the sole consideration in determining whether a fee is reasonable. If a lawyer charges a reasonable retainer and is retained for the purpose of providing specified services, but never performs those services, the fee charged would become unreasonable. Just as a lawyer cannot bill a client for work he has never performed in the past, a lawyer cannot bill a client for work he will never perform in the future. In this case, the Committee sanctioned the attorneys, not because of the amount of the retainer, but because the Committee found that the attorneys did not provide the services for which they were paid. We do not reverse decisions made by the Committee unless we find, from our *de novo* review, that its findings were clearly erroneous. *Muhammed* v. *Committee on Professional Conduct*, 291 Ark. 29, 722 S.W.2d 280 (1987). We cannot say the findings of the Committee were clearly erroneous.

Immediately after their employment in July of 1988, the law firm obtained a temporary restraining order staying the foreclosure sale, but the petition to make the order permanent was dismissed. It is undisputed that these actions took only a small amount of the attorneys' time. The foreclosure sale was held, and the Stoppels lost their land. Leon Stoppel testified that he began to have difficulty in getting Arens to respond to his phone calls. The Stoppels' case was assigned to another lawyer in the firm. On April 20, 1989, some eight (8) months after the firm's employment, a lenders' liability suit was filed in a federal district court in Kansas against three (3) defendants, the Farm Credit Bank of Wichita, the Federal Land Bank Association of Colby, and the Northwest Kansas Production Credit Association. The complaint contained several state common law claims submitted under the pendant jurisdiction of the federal court. On September 26, 1989, the district court dismissed the complaint for failure

to state a claim upon which relief can be granted. The reasoning of the district judge was that there was no private right of action under the Agricultural Credit Act of 1987, there was no federal question pending in the state claims, and there was no diversity jurisdiction.

On October 9, 1989, the Stoppels went to Fayetteville to see their lawyers. They met with Arens, Alexander, and another attorney in the firm and decided not to appeal the district court's ruling. Instead, they decided to wait a short while and see whether Congress included a private right of action in the Farm Credit Act of 1990. The Stoppels were told that the law firm had friends in Congress who were going to attempt to amend the Act to include a private right of action. Nothing came of this, and it was decided that the state claims should be filed in state court. Leon Stoppel stated that he and his wife were adamant about filing the lenders' liability suit based upon common law in state court, and that they were told the principals of the law firm would become personally involved, and that it would be filed around January 1, 1990. Alexander admitted it would have taken very little more work to file a complaint in state court since the state claims had already been stated in the federal complaint.

Leon Stoppel attempted to phone Alexander several times but was unable to reach him. Stoppel never received a return call. On November 10, 1989, Leon Stoppel sent a letter to Alexander expressing reservations about continuing the action, and concluding: "I have tried reaching you by telephone and have not received your return. I believe this is a matter we should discuss. We will be anxiously waiting to hear from you in this most important matter." He received no response and was not able to find out whether the state complaint was ready for filing.

On January 29, 1990, the Stoppels went to Fayetteville to confront Arens about the lack of action in their case. Leon Stoppel testified that they went into Arens' office and the following occurred:

> John [Arens] went back and said, "I'll have to find out where the file is," and the file should have been with Richard Alexander because he was the one that was going to take personal charge of the case, and he found it on the desk of a fellow by the name of Linzay. . . . The only

thing that I know is that when we went to John's office and he went to find the file, it was in Mr. Linzay's office, and John made the statement, he said, "I found this in Mr. Linzay's office. He hasn't done a thing on it, and I'm going to fire that man."

Leon Stoppel testified that he told both Arens and Alexander that he had lost all confidence in them and "John [Arens] said to me, he says, 'You don't have any money coming, and if you think you do have any money coming, you're going to have to hassle me for it.' " The Stoppels left Fayetteville and returned to their home in Kansas. Soon thereafter, a secretary in the law firm called the Stoppels and asked what they intended to do. Leon testified that he replied, "We want an accounting of our money and we want our files."

On February 12, 1990, the Stoppels sent a letter to Arens making their position very clear. It stated that they thought they had been "shuffled and re-shuffled" among various members of the firm, and that the firm had not lived up to its part of the contract. He asked for their files and an accounting.

In summation, after being employed in July 1988 to immediately and fully pursue the claims of lenders' liability, the law firm, by late January 1990, had obtained a temporary restraining order in the pending foreclosure suit, applied for an injunction in the same proceeding, and filed a complaint under the Agricultural Credit Act of 1987. The temporary restraining order was dissolved, the application for an injunction was dismissed, and the complaint in federal district court filed pursuant to the agricultural act was dismissed for failure to state a claim upon which relief could be granted. Nothing more had been done. No depositions had been taken. No trials had been held. No appeals were taken and, most importantly, the state cause of action had not been filed.

On February 27, 1990, after being discharged, the law firm responded by letter to the Stoppels and stated that it would give an accounting and enclosed a complaint to be filed in state court. The state court complaint was almost a replication of the federal complaint. The caption was different but references were made to federal rules. In describing the complaint enclosed in the letter Leon Stoppel testified as follows:

Then later on I got a letter from Richard [Alexander], and then he sends me a case which is the same case that was filed in the federal court. All he did was change the top page.

I showed it to my [Kansas] attorney, and my attorney said, "No way could I ever take anything like that into court." He said, "That judge would just shave my head." He said, "This case has to be redrafted and pull from that case what applies to the Federal part of it and then make your State case out of whatever you can use out from that Federal case."

On March 8, 1990, Leon Stoppel again wrote the firm asking for their files and for an accounting, as they had received neither. On April 28, 1990, they filed this complaint with the Committee. On June 1, 1990, the lawyers gave an "accounting" for 1,133.25 hours work on the case by 12 different attorneys. The lawyers admit that regular work records were not kept; that the attorneys in the firm were asked only to keep sufficient records for the firm to see how it was allocating its resources. This "accounting" reflected that one lawyer spent 200 hours preparing the complaint for federal court and that, subsequently, 300 to 400 hours were spent on research relating to the complaint.

As previously set out, the Committee found that the attorneys' fees were not "reasonably commensurate with the circumstances." There was substantial evidence from which the Committee could find that the $60,000 retainer was paid to fully litigate the Stoppels' claim of lenders' liability in federal and state courts, but the lawyers failed to so do. In addition, there was substantial evidence from which the Committee could find that the cases were to be pursued immediately upon payment of the retainer and that the state claim was to be filed around January 1, 1990, but the lawyers failed to perform that agreement. There was substantial evidence from which the Committee could find that Arens and Alexander were to be personally involved in the state action, but failed to be so involved. Finally, the Committee, composed primarily of lawyers, was free to believe or disbelieve that 600 to 700 hours, or perhaps more than three (3) months work, were spent on researching and preparing one complaint. We cannot say that the Committee's finding that the fee was not

"reasonably commensurate with the circumstances" is clearly erroneous.

■ In addition, the Committee sanctioned the appellant attorneys for failing to take steps to the extent reasonably practicable to protect their client's interests upon termination of representation. We cannot say that finding is in error. Rule 1.16(d) of the Model Rules of Professional Conduct provides that, upon termination of representation, a lawyer must take steps to the extent reasonably practicable to protect his client's interests, and surrender to the client his papers and property. Leon Stoppel testified that the appellant would not return the Stoppels' files to them. The appellants did not rebut that testimony in any manner.

The appellants next argue that the participation of Committee member Jim McKenzie violated their rights of due process and fundamental fairness. This argument comes about in the following manner: In 1937, a George Christopher founded the Christopher Oil Co., Inc., which has its principal place of business in Prescott. The oil company apparently was a very successful business. In 1973, George Christopher and his wife, Evangelina, the principal stockholders in the oil company, placed all of the common stock of the oil company in a trust. This multi-million dollar trust fund was to distribute sufficient funds to the Christophers to maintain them during their lives and then to pay 70% of the remainder to Ouachita Baptist University, 15% to the Church of Christ of Prescott, and 15% to the Presbyterian Church of Prescott. Horace McKenzie, the father and law partner of Committee member Jim McKenzie, was a trustee of the Christopher trust and the secretary of the Christopher Oil Co., Inc. and received $300 per month as secretary of the oil company. In 1987, the law firm of Arens and Alexander filed a suit on behalf of George and Evangelina Christopher to dissolve the trust. Horace McKenzie was named as a defendant. The allegations against him were common to all of the defendants. He was never deposed, and the suit was settled amicably. The trust was dissolved, and the corpus was distributed back to the Christophers.

■■ Jim McKenzie's name appears on the Committee's letter head, and the appellant received letters from the Commit-

tee prior to the hearing. They clearly had notice he was a Committee member. Yet, the appellants never suggested before the sanctions were announced that he should disqualify because of the trust case. However, after the Committee issued the sanction, the appellants argued that McKenzie's participation was a violation of their rights of due process and fundamental fairness. The argument is without merit for two (2) reasons. First, the appellants waived the issue by waiting until the outcome of the case and then, after not liking the result, moving to disqualify the trier of fact. Secondly, we are satisfied from the record that McKenzie did not regard the trust suit as a personal matter and that he harbored no ill feelings whatsoever against the appellants for representing a client in seeking to dissolve a trust.

Accordingly, we affirm the Committee's entry into its records of letters of caution against the appellants.

NEWBERN, J., not participating.