**In re Daisy M. PRUDHOMME, Debtor.**

**In re John T. BATTEN, Jr., Kathleen Prudhomme Batten, Debtors.**

**Bankruptcy Nos. 91BK–81053–A11, 91BK–81434 A11.**

United States Bankruptcy Court,
W.D. Louisiana,
Alexandria Division.

Jan. 29, 1993.

See also 152 B.R. 81.

Robert L. Royer, Alexandria, LA, Richard P. Alexander, Gregory T. House, John F. Arens, Eldered N. Bell, Jr., Joshua Joy Dara, Sr., and Terry A. Zelinski, Fayetteville, AR, for the debtors.

Kenneth D. McCoy, Natchitoches, LA, Jeff Bohm and Ms. Deborah L. Livingston, Austin, TX, for Farm Credit Bank.

Frances H. Strange, Shreveport, LA, for the U.S. Trustee.

Brett Brunson, Natchitoches, LA, for the Plan Trustee.

## REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

These matters came on for hearings on October 28, 1992, on the Motion for Examination of Debtors' Transactions with Debtors' Attorney, the Motion for Disgorgement filed by the Farm Credit Bank ("FCB") directed to the Arens Law Firm and the Intervention by the Trustee. Also

on for hearing was the Motion to Withdraw as Counsel to the Debtors filed by Eldered N. Bell, Jr., together with the FCB's Opposition to same. A response to the motion to disgorge was filed on behalf of the Arens Law Firm. Mr. Bell filed a reply to FCB's objection to his withdrawal.[1] The hearings were consolidated for evidentiary purposes. Evidence was adduced and a briefing schedule established. Subsequent to the hearing, a motion to Strike FCB's Memorandum was filed by John F. Arens and a Motion to Strike Entry of Appearance and/or Motion to Withdraw as Counsel was filed by Richard P. Alexander. The United States Trustee filed an objection to the latter request by Mr. Alexander. FCB in turn filed a Motion to Strike various affidavits and a purported billing summary filed by the Arens Firm subsequent to the hearing.

These are Core Proceedings pursuant to 28 U.S.C. § 157(b)(2). This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and by virtue of the reference by the District Court pursuant to Local District Court Rule 22.01 incorporated into Local Bankruptcy Rule 1.2. No party at interest has sought to withdraw the reference to the Bankruptcy Court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these Reasons, an order of disgorgement will be directed against John F. Arens in the amount of $75,000.00. The motions to withdraw filed by Eldered N. Bell and Richard P. Alexander will be granted and the objections overruled. The Motion to Strike filed by John F. Arens will be denied. The Motion to Strike filed by FCB will be granted.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### I. Background

Daisy Prudhomme filed a voluntary petition under Chapter 11 on July 30, 1991.

John and Kathleen Batten filed a voluntary petition under Chapter 11 on October 15, 1991. Ultimately, plans filed on behalf of the Farm Credit Bank of Texas ("FCB") were confirmed in both cases. FCB's plan was confirmed in the Prudhomme case after counsel to debtor, Mr. Gregory T. House, withdrew an objection by the Battens and stipulated to the confirmation. Therefore, a virtually identical plan was confirmed in the Prudhomme case after this Court held that House's statement constituted a judicial admission.

This Court has filed extensive written opinions in these cases. On January 31, 1992, written reasons were assigned relating to the Motion of the Farm Credit Bank for Relief from the Automatic Stay in the Batten case. On February 10, 1992, written reasons were assigned disapproving the Disclosure Statement filed by the Farm Credit Bank of Texas in the Prudhomme case. On June 10, 1992, written reasons were assigned in the Batten case disapproving the Battens' Disclosure Statement. *In re Batten*, 141 B.R. 899 (Bkrtcy.W.D.La. 1992). On October 8, 1992, written reasons were assigned in both cases concerning a discovery matter. On November 24, 1992, written reasons were assigned concerning the application for compensation of Mr. Robert Royer, as local counsel for debtors in the Prudhomme case.

#### A. The Motions to Disgorge and Examine

The present motions and interventions concern the employment by the debtors of the Arens Law Firm and the compensation allegedly received by that firm. A total of $75,000.00 was paid to the Arens Firm. Fifty thousand was paid February 26, 1990. The balance of $25,000.00 was paid February 27, 1991.

The thrust of these motions is that neither the applications for employment nor the various disclosure statements filed on

---

1. The Farm Credit Bank had also objected to the Motion to Withdraw filed by Terry J. Zelinski. The objection to that motion was withdrawn at

the hearing and an order was signed permitting her to withdraw.

behalf of debtors made timely and complete disclosure of the facts surrounding the Arens Firm's fee arrangements with the debtors, which also involved a contingent fee arrangement.

### B. The Responses

Eldered N. Bell, Jr., filed a "Reply to Opposition to Motion for Withdrawal and Substitution of Counsel." In that document, Bell asserted that he was no longer associated with the Arens Firm having resigned effective August 31, 1992. The reply asserts, *inter alia*, that any retainer paid or agreement relating to same occurred prior to his association with the firm which began in April of 1991. Further, Bell asserts that the Arens Law Firm was a sole proprietorship, not a partnership, and that he was only a salaried employee.

The initial response filed on behalf of the Arens Law Firm asserts that debtors retained the firm "to assist ... in civil litigation against the FCB and not for bankruptcy." Response filed September 3, 1992, Prudhomme case. The response continues:

"... any payment made to the Arens Law Firm for purposes of civil litigation against the FCB was not made after one year before the date of the filing of the debtor's bankruptcy as required by 11 USC § 329 petition [sic]. Therefore, since the Arens Law Firm was retained solely for civil litigation against the FCB and not retained for the purposes of bankruptcy, the FCB's Motion for Disgorgement under the bankruptcy code should be denied.

Alternatively, if the court should find that the Arens Law Firm received a retainer from the debtor directly or indirectly for the purposes of bankruptcy, the Arens Law Firm would argue that said retainer is not excessive."

*Id.*

On December 29, 1992, John F. Arens filed a "Motion to Strike Memorandum of Farm Credit Bank of Texas Filed In Support of Its Motion for Disgorgement" and a "Memorandum in Response to the Brief of the United States Trustee Filed in Support of Its Motion For Examination of the Debtors' Transactions with Its Attorneys."

The Motion to Strike asserts that FCB's Motion and Memorandum contain "immaterial, impertinent, and scandalous matters." In short, the motion asserts that FCB's filing "levels a personal attack against John F. Arens which included literally pages of nonrelevant commentary intended to slander John Arens and demean this Court." Motion to Strike filed December 29, 1992.

The Arens' memorandum was late-filed even though two extensions were granted. *See* minute entries dated December 17, 1992 and December 21, 1992. Attached to the memorandum are affidavits of Arens, Richard P. Alexander, and Corinne Corley. In addition, a "Consolidated Summary of Bankruptcy Accounting of John Batten, Kathleen Batten, and Daisy Prudhomme" is attached. It contains the following "hourly summary:"

| "Employee | NO. OF HOURS |
|---|---|
| Eldered N. Bell | 27.00 |
| Gregory T. House | 156.50 |
| Terry A. Zelinski | 199.00 |
| Law Clerks | 2.00 |
| Total Time | 384.50* |

* This is only a partial record of time and billing as the records have not been completed. Upon completion of final accounting, a full record will be made available." [2]

Attached to this page are computer printout sheets entitled "Review Statement for Internal Use Only." These pages are followed, in turn, by a listing of expenses and a "Recap" of professional services listing the time spent by the following: Clerk 2 hours, Eldered N. Bell 27 hours, Gregory

---

**2.** As of the filing of this opinion, no new or additional time and billing records have been submitted to the Court.

T. House 155.05 hours, and Terry A. Zelinski 161.60 hours.

On December 28, 1992, Richard P. Alexander filed a Motion to Strike Entry of Appearance and/or Motion to Withdraw as Counsel.[3] The United States Trustee filed an objection to the relief requested by Mr. Alexander. FCB also seeks to strike the various affidavits and billing summary submitted by the Arens Firm.

## II. The Evidence
### A. Debtors' Testimony

These Debtors previously filed Chapter 12 proceedings in 1987. Those cases were ultimately dismissed, due to the fact that the total indebtedness in the Batten case exceeded the maximum amount allowable for debtors under that Chapter. Mr. Batten testified that, once their Chapter 12 cases were dismissed, they sought to restructure their obligations to FCB. When those efforts were unsuccessful, they filed an appeal. Anticipating that effort might also be unsuccessful, they sought legal advice. They were unable to locate any attorneys in Natchitoches, Louisiana, who would sue FCB. They attended a meeting of members of the American Agricultural Movement. The firm of Arens and Alexander was mentioned. The name was later mentioned in contacts with the staffs of the United States Senators from Louisiana and a Congressman.

Mr. and Mrs. Batten sought and had a meeting with Mr. Arens. After having a morning meeting, they broke for lunch. After lunch, Mr. Alexander joined them. They left with the proposed letter agreement. They returned to Natchitoches and discussed the matter with Daisy Prudhomme. After considering the matter, they signed the letter and made the first payment. Their understanding was that the firm would assist them in their efforts against FCB no matter how much time was required. They perceived that the Arens Firm was a "world class law firm," a per-

ception that was shared with their local counsel. Reasons for Decision, November 24, 1992, p. 6. Later, Mr. and Mrs. Batten returned to Fayetteville for a meeting with the attorneys in the Arens Firm concerning their disclosure statements. A year later they received a call from Arens requesting the payment of the balance; this, debtors testified, was requested by Arens so that he could advise the Court that nothing was owed. The Battens were never advised that the firm was acting in a *pro bono* capacity in their bankruptcy. They were not advised that the firm did not handle Chapter 11 bankruptcies, a position Arens adopted in his deposition, which does not square with the facts.

FCB's plan in the Prudhomme case provided for the dismissal of the suit against FCB. Mr. Batten testified they were not made aware of that provision prior to the confirmation hearing. At that time, Mr. House, affirmatively withdrew an objection filed by Mr. and Mrs. Batten in the Prudhomme case and stipulated that FCB's plan should be confirmed. Mr. Batten testified that they first became aware of that provision at a post-confirmation meeting with the Plan Trustee.

Mr. Batten testified that there was considerable confusion in the firm relating to responsibility for their case. Phone calls were not returned. They seemed to be represented by several attorneys. Paralegals and other members of the staff called to obtain information about the disclosure statements, but the attorneys did not call personally. As of the date of the hearing on the instant motions, the Arens Firm had not been dismissed. Mr. Batten stated that he resented the fact that Arens did not personally attend the hearings on the disgorgement issues.

Mr. Batten testified that he never received any bills from the firm. He testified that once FCB's plan was confirmed in the Prudhomme case, the firm became disinterested. Just prior to the hearing, Mr. Bat-

---

**3.** Mr. Alexander correctly observes in his motion that in this Court's Findings of Fact and Conclusions of Law filed October 8, 1992, at footnote 4, page 6, the Court noted that it had permitted Alexander to withdraw from the Batten case but not the Prudhomme case, since he had not sought the latter relief.

ten received a letter from Mr. Arens. UST Exh. 1. In that letter, Mr. Arens asserts that an individual attorney attempted to destroy the firm. Mr. Batten testified that, in his opinion, Mr. Arens was referring to Mr. Bell. In Batten's opinion, Mr. Arens seemed by the letter to have admitted that some of the staff was not competent. Asked if he had read the *Stoppel, infra,* opinion, Mr. Batten acknowledged that he had, and stated that his own case was basically a carbon copy of what occurred there.

Mr. Batten acknowledged that bankruptcy was not an option mentioned on the date of the first meeting with Arens or Alexander. Mrs. Batten generally corroborated Mr. Batten's testimony. She testified that the efforts of the Arens Firm may have hurt more than helped their case. She testified that once Daisy Prudhomme's case was over, the firm no longer cared. Mrs. Batten testified that fees regarding the bankruptcy *per se* were never discussed with her.

Miss Prudhomme testified that she had never met Mr. Arens. Mr. Batten handled most of her contacts with the firm. She talked to Mr. Bell on an occasion when Mr. Batten was hospitalized. She was not advised that her bankruptcy would be handled for free. She could not attest to any benefit rendered by the firm's services. She first learned of the dismissal of the lawsuit against FCB at a post-confirmation meeting, at which the Trustee's attorney was also present. She testified that she thought she would lose everything she had if FCB's plan was confirmed, but did not think she had a choice. She recalled that Mr. House told her she would "lose everything" and was aware that he agreed to the confirmation of FCB's plan. She recalled no discussion of filing a Chapter 12 for her alone as opposed to Mr. Batten. Contrary to Mr. Bell's affidavit, she had no discussions with him relating to hourly fees and expenses.

### B. The Players

#### 1. The Cast

Four members of the Arens Firm sought admission *pro hac vice* in one or both of the instant cases. On September 4, 1991, an Application to Admit to Practice *pro hac vice* was filed by Eldered N. Bell, Jr., in the Prudhomme case. UST Exh. 6. Attached to same is an affidavit attesting that "Neither [affiant], the firm of Arens and Alexander, nor any member or associate thereof, insofar as I have been able to ascertain, has any connection with the trustee herein, the estate's creditors, or any other party in interest." Further, in his application, Bell asserts that he does not represent any adverse interest to the estate, the trustee, or the debtor, and is a disinterested person within the meaning of 11 U.S.C. § 101(13) and § 327 of the Bankruptcy Code. The affidavit reads that the applicant has " . . . advised the Debtor in Possession of the firm's willingness to serve as their counsel upon the agreement by Debtor-in-Possession to pay the firm hourly fees plus expenses as approved by the Bankruptcy Court." An order approving the appointment was entered on Sept. 9, 1991. UST Exh. 7. On November 7, 1991, an application was filed on behalf of Terry A. Zelinski, also a member of the Arens Firm. An order authorizing her employment was entered on November 14, 1991, in the Prudhomme case.

On November 15, 1991, Ms. Zelinski filed an application to be employed in the Batten case. The accompanying affidavit recites that "to the best of her knowledge, the Arens Law Firm and its members represent no interest adverse to [debtors], with respect to any of the matters upon which the firm has been or is to be engaged by the debtors in the captioned proceeding, and that the firm and its members are 'disinterested' within the meaning of the Bankruptcy Code." An order authorizing her employment in Batten was entered on November 14, 1991, to become effective upon service on the United States. On December 18, 1991, an Application to enroll as Counsel *pro hac vice* was filed in both the Batten and Prudhomme cases by Gregory T. House.[4] On January 24, 1992, an

---

**4.** This Court's observation in its Reasons for Decision dated October 8, 1992, page 6, footnote

application to enroll as counsel was filed by Richard P. Alexander in the Batten case. Mr. Alexander did not actually sign his application nor did he authorize anyone else to do so. Deposition, Alexander, 37:15–37:23.

In June of 1992, Zelinski prepared an application for John Arens to enroll *pro hac vice* in the Batten case but it was never filed. Deposition, Zelinski, 48:20–49:1.

Ms. Zelinski filed the original Disclosure Statement in the Batten case on February 12, 1992, and the First Amended Disclosure Statement on April 9, 1992. Mr. House appears to have signed on behalf of Mr. Bell on the Second and Third Amended Disclosure Statements filed April 30, 1992, and May 18, 1992, respectively. Zelinski also signed the only Disclosure Statement in the Prudhomme case filed January 10, 1992. Mr. Alexander personally signed no pleadings, other than his motion to withdraw, inasmuch as his original motions to enroll as counsel were not personally signed by him.

### 2. Supporting Roles

In addition to the attorneys who actually enrolled, other attorneys played supporting roles. Mr. Joshua J. Dara began an association with the Arens Law Firm in May of 1989. He resigned in May 1992. Deposition, Dara, 3:3–3:14. Mr. Dara signed a Notice of Appeal in the Batten case on August 14, 1992. That Notice was withdrawn pursuant to a motion executed by him on August 27, 1992. *Id.* Exh. A and B. On those dates Mr. Dara was no longer associated with the Arens Firm. Dara maintains an office in the same building. *Id.* 19:22.

Mr. Dara is admitted to practice in Louisiana. *Id.* 7:21. He filed no motion for admission *pro hac vice*. His explanation for signing the documents is that no attorney admitted to practice before this Court was available to sign same so he agreed to assist. *Id.* 19:121–22:12. The pleadings reflect that the firm name is shown on the documents. At about that same time Mr. Dara had a conversation with Mr. and Mrs.

Batten relating to the case and the pleadings. *Id.* 24:2–24:10. He confirmed with Mr. Batten the instructions to withdraw the appeal. *Id.* 25:1–25:15. He claims that the Battens knew he was no longer affiliated with the firm. *Id.* 25:20–26:11. On other occasions, Dara talked to the Battens as a friend of the family. *Id.* 26:17. He also signed various pleadings in the State Court litigation and, following the removal of the lender liability action, in the United States District Court. *Id.* Exh. C–E. He also signed a letter to a Natchitoches attorney concerning the Battens. *Id.* Exh. F. He met Miss Prudhomme at a hearing in the Natchitoches Parish Court. *Id.* 41:7–42:24. A further explanation for his role is that Mr. Dara is a foreign student whom John Arens is assisting with his Visa. *Id.* 37:20–39:11. Mr. Dara also signed the certificate of service to Mr. Arens' Response to Motion For Disgorgement of Retainer. *Id.* Exh. G.

Mr. Dara identifies Mr. Arens as the "ultimate decision maker" in the firm, although Mr. Dara perceived that Mr. Bell was in charge of the Batten case as of the date of his deposition despite Bell's earlier resignation from the firm. *Id.* 40:1–41:8.

As of the date of the October 28, 1992 disgorgement hearing, in addition to Mr. Dara, all of the attorneys mentioned had become disassociated with the Arens Firm. Mr. Alexander left the firm in July, 1991. At that time, he was behind on his pay and had management differences with Arens. Deposition, Alexander, 10:13–10:20. During Alexander's association with the firm, even during the period in which the firm was named Arens and Alexander, despite some discussion of a partnership, the firm was a sole proprietorship. Alexander was a salaried employee. *Id.* 8:13–8:20. Both Mr. Alexander and Mr. House identify Mr. Bell as the attorney in charge of the Batten and Prudhomme cases once Mr. Bell became associated with the firm. *Id.* 16:33–17:1, Deposition, House, 23:15–23:24. Mr. Alexander did not authorize pleadings to be filed in these cases bearing his signature.

---

4, that Mr. House did not enroll in the Prudhomme case is incorrect. The application in

Batten bears the Prudhomme case caption handwritten by the Court.

Deposition, Alexander, 37:24–38:12. He made one appearance in the State Court injunction action and was met with an objection by FCB. *Id.* 39:7–39:22.

As noted, *supra,* both Mr. House and Ms. Zelinski have resigned from the firm. Both were behind on their compensation at the time of their departure. Deposition, House, 11:15–11:16, Deposition, Zelinski, 4:11–4:13. House pinpoints Bell as the attorney "generally" in charge of the Batten file. Deposition, House, 23:15–23:21. He describes Bell's duties as follows:

"Well, in the firm we had this policy that the person who was considered lead attorney was the one that was responsible for meeting deadlines, formulating the strategy, making sure the work got completed, and basically ramrodded the case. So that was what I understood the duties were."

*Id.* 24:4–24:9.

He further identifies Bell as the person to whom he looked for decision-making in the Batten and Prudhomme cases. *Id.* 25:2–26:7. House identifies Bell as the strategist on cases rather than Arens, *Id.* 26:8–26:20, although he acknowledges that Mr. Bell joined the firm after the cases were in progress. *Id.* 27:10–27:13.

Ms. Zelinski, however, says that although Mr. Alexander was in charge of these cases during his tenure with the firm, after his departure, the matter was "... up in the air, Ed [Bell], because he was the administrative—you know was reassigning cases, took it, and then it was reassigned to Greg House." Deposition, Zelinski, 19:9–19:21. He was in charge "... once it was assigned to him." *Id.* 39:20–23. It was Arens who made a critical decision in the Batten case. "He made the decision not to let me advise the Battens to convert their case to a Chapter 7." *Id.* 44:9–44:14. Arens forbade Ms. Zelinski from discussing such an option with Debtors. Ms. Zelinski perceived that the Battens might have had "a better chance of retaining their lawsuit ... [due to the possibility that] the trustee might have pursued it or abandoned it back to them." *Id.* 44:15–45:3. According to Ms. Zelinski, Mr. Arens, not Mr. Bell, advised her expressly not to discuss the conversion option with debtors. At a later point in the deposition, she states that Arens did not actually say not to have the discussion, but that he would "deal with them." Compare 45:9–45:14 and 45:7–45:17.

Ms. Zelinski identifies Arens as the ultimate strategist and attorney-in-charge; although Alexander made the original decision to have a bankruptcy petition prepared for Miss Prudhomme. *Id.* 49:13–50:2. Mr. Arens controls the "checkbook." *Id.* 8:7–8.8.

Mr. Bell wrote a letter of resignation on August 14, 1992, to Arens to be effective August 31, 1992. Deposition, Bell, 19:1–19.25. During the weekend following the delivery of the letter to Arens' secretary, Bell was effectively barred from the office. *Id.* 20:3–20:19. He had not been paid for his services at the time of his deposition. *Id.* 28:11–28:13.

Bell described his duties as follows:

"And so, describing the function, when a new case would come in, generally I would look down and see—look down the list of cases and clients and attorneys and who had what cases and try to get a feel, by talking to the attorney—various attorneys, what their caseload was like, what the status of some of their other cases were, if they were—you know, had already been tried and were awaiting an opinion, or if they were on appeal, if they were in heavy discovery, just where things were going, if they could take another case, if they couldn't. We would reassign cases between people for various reasons, and that was the general function of the job."

*Id.* 27:17–28:2.

Bell maintains that it was House who was assigned to these cases. He maintains that all the attorneys reported to Arens. *Id.* 60:13–61:8. He testified that Arens controlled the firm. *Id.* 57:18. The decision process was at "John's level." *Id.* 62:2. In Bell's words:

"It wasn't something—it's not—what I was trying to say earlier, it's not a formalized law firm. It doesn't work like

most law firms. As a result, if it were something where we had nobody to cover a hearing, if he found out—normally if he didn't find out about it, if it was brought to my attention, I would make sure the hearing got covered. If it went to his attention, he would tell somebody to do it. I mean those kinds of decisions, the day-to-day running of it, I suppose I did as much as I could. However, it was always up to John. John would overrule it. John would decide what he wanted to do and tactically, John would make those decisions."

*Id.* 62:14–62:24.

Questioned regarding any specific decision Arens made about the Batten or Prudhomme case, Bell replied:

A. "No, I can't say that I do. To try to get a specific time, I couldn't do that. It was more free flowing than that. I mean, he [Arens] would talk to Greg House directly and I wouldn't be privy to it so I wouldn't know what they talked about particularly.

Q. Did Greg tell you that he would meet with John Arens?

A. Not necessarily. Greg preceded me in the law firm, so, I mean, he was more of an 'insider,' if you will, if there were insiders. He had been in performance. He had no compunctions about talking to John, whereas a younger attorney, if we got somebody out of school, we generally—generally I could work with them a little bit more, but not—not—"

*Id.* 63:3–63:14.

Ms. Corinne Corley participated in the state court litigation. She also may have reviewed some of the bankruptcy documentation. *See, e.g.,* Deposition Zelinski, 20:1; 25:2; 25:25; 26:1. She asked Zelinski to sign a pleading over the signature of local counsel to be filed in the United States District Court for the Western District of Louisiana, to which the lender liability action was removed. *Id.* 67:11–67:25. How-

ever, it appears that local counsel never signed that pleading, which bore his name followed by Ms. Zelinski's initials. She had no explanation for this occurrence and was unaware of same until her deposition was taken. *Id.* 82:8–83:16.

3. The Starring Role

As noted, Mr. Arens did not attend the hearings which prompted this opinion. Further, he never enrolled as counsel or made any appearance in this Court. Mr. Arens, however, gave his deposition, dated October 13, 1992, which was filed into evidence. His role overshadows the other members of the firm in the instant drama. Mr. Arens established an office in Fayetteville, Arkansas, in 1981. The firm has been known by various names, but principally Arens and Alexander or the "Arens" Firm. Deposition, Arens, 15:8–15:14. During the time Mr. Alexander was affiliated with the firm, he was a salaried employee. *Id.* 15:17–15:24. Arens operated as a sole proprietorship, although there was an unwritten agreement to share "profits." *Id.* 16:1–16:13.

Arens testified that Bell would not have received any portion of any profits made by the firm. Deposition, Arens, 124:5–124:7. Arens describes the role of Bell as "... complete responsibility for the firm. So again, I don't mean to shelter my own responsibility, but he certainly had the day-to-day responsibility for supervision." *Id.* 125:5–125:10. Messrs. Alexander and Bell bore no responsibility for expenses. *Id.*

Mr. Arens testified that the firm policy is for lawyers to keep track of their time, but he has no knowledge of the time system used. It "involves a computer." *Id.* 28:4–28:19. The policy did not apply to Arens, who was the only "trial attorney." His secretary may have kept some records of his time. *Id.* 28:21–29:4.

Mr. Alexander was the "administrative person" in the firm during his tenure. Mr. Bell followed Mr. Alexander in that capacity.[5] *Id.* 29:5–29:20. To Arens' knowledge

---

**5.** In Arens view, Mr. Bell was on a "mission ... to destroy the firm. And from day one with our firm he took control, he had his wife take over our accounts, he had somebody take over our

books, he then set about a pattern of angering clients, doing nothing, and just basically creating the worse [sic] circumstance, and which ultimately resulted in the largest Ag law firm in

the firm never billed a farmer. In his opinion, that was the only way to "... do battle with an awesome foe like the Farm Credit System with Fifty Billion Dollars available. It was just impossible for a farmer, a broke farmer to hire a lawyer and pay him by the hour. So for a decade, and I think some satisfactory results, we have battled on behalf of farmers and never sent a bill as far as [sic] know...." *Id.* 30:8–30:14. Instead, representation was undertaken on a lump sum fee basis.[6] According to Arens' memorandum, at page 2; the fee in the instant case was fixed at approximately five percent of the debt to FCB.

Mr. Arens suggests that more than 750 hours were spent on behalf of the debtors in their restructuring efforts. They usually apply to Courts at $100.00 per hour. *Id.* 50:24. Arens explains he was not involved in the non-disclosure of the potential cause

of action. In fact, he was unaware that the bankruptcies had been filed and would not have authorized the filings. He claims Bell was responsible for the decision to file. *Id.* 53:13–54:16. In fact, he claims he was out of the country when the decisions to file were made. *Id.* 54:23.

Arens says that during the "decade ... [he] was involved ... [he] never made the decision to file a Chapter Eleven bankruptcy for a farm borrower. In my opinion it's an absolute waste of time. You lose your cause of action because you go in with a judge trial. It is always the most hostile forum in my opinion...." *Id.* 53:17–53:22.

Mr. Arens states that very few members of his firm "do bankruptcies." *Id.* 83:4. He says that he would never have agreed to do a bankruptcy for the Debtors "a year and a half down the line.... We didn't have anyone in my firm that had ever, as far as I knew at that time, that had ever

the country going to nothing in one year." *Id.* 33:1–33:8.

Mr. Arens "... suspect[s] part of my suppose would be that the Farm Credit System felt that the easiest way to get me out of their hair, we fought them all over this country aggressively, was to have somebody come in and put me out of business, or the Chicago Board of Trade, or the FMHA, or maybe he just got in and decided that he just wanted to run off the clients...." *Id.* 33:13–33:19.

Mr. Arens claims to have learned that Mr. Bell is a "former CIA." *Id.* 135:12.

Mr. Arens is no stranger to theories of conspiracy. Mr. Arens' formerly held positions with Trace X Chemical, Inc., and Harbinger Oil Corporation. *Id.* 4:19–4:20. As noted by FCB at page 7 of its memorandum, despite his testimony to the contrary at p. 14, his activities continued after he started his law firm. A jury verdict in favor of Arens and Trace X was overturned by the Eight Circuit in *Trace X Chem., Inc. v. Canadian Indus., Ltd.,* 738 F.2d 261 (8th Cir. 1984).

Arens has had personal experience with failed businesses. He was acquitted of charges of mail and securities fraud after the failure of Harbinger. *See Spraque, Thall & Albert v. Arens,* Civil A. No. 85–1925, 1986 WL 2456 (E.D.Pa. Feb. 20, 1986), Exhibit A to FCB's Memorandum. He thereafter refused to pay his attorneys fees and sought to hold the now-bankrupt Harbinger liable for an indemnity claim. The Court rejected this contention relying on the doctrine of *res judicata,* holding, *inter alia,* that he should have raised the claim in Harbing-

er's bankruptcy, filed under Chapter XI of the Bankruptcy Act.

**6.** Arens describes himself in the following terms:

"... I am a cynic when it comes to the Farm Credit System. In my opinion they are absolutely evil and they make no efforts to *restructure at all. And in fact our experience is,* is that although that is [sic] necessary to a civil litigation, yet never do they treat the farmer/borrowers fairly. When you go to the Credit Review Committee you are sitting there with the Board of Directors who always—of course I'm exaggerating in my absolute statements, but in my opinion they always rubber stamp what the—what the—decision the officers make. So in my experience which has been broad, maybe as broad as anyone in this country, it is an absolute farce to go through the restructuring. The Farm Credit System has no intent, the only reason they agreed to that was so that Congress would bail them out to the tune of Billions of Dollars. And they have never made a good faith effort. *And in fact lobbied to have the law read that they would only restructure if it was the best way for the Farm Credit System to collect their money.* It is clear to anyone that works in this area of law that the Farm Credit System takes the position the best thing to do is foreclose on the farmers, put them out of business, sell them out, and take everything they have. In bankruptcies the reason we don't even get close to—or ordinarily I'd never get involved in the bankruptcy with the Farm Credit Systems, it's an absolute rape." *Id.* 47:17–48:19.

done a Chapter Eleven bankruptcy." *Id.* 83:5–83:9. He stated the Battens were aware of this. In fact, recalling that they had been in a prior bankruptcy, Mr. Arens observed:

"They had just gotten out of a bankruptcy, as I recall. And so the conversation would have been that's good that you got out. You would have gotten raped in the bankruptcy. The system isn't fair to farmers. I would have told them that, I'm very, very blunt. I would say this to a Judge, and I have done it. It's a crooked system when it comes to farmers. You will always lose everything you have if you go into a bankruptcy. The attorneys will get it all, for the Farm Credit System. The Farm Credit System will get it all, you will lose everything. I would have said that to them. That's tantamount to saying I'm not going to file a bankruptcy for you. You are not hiring me to do a bankruptcy. I, ordinarily in those interviews I will tell them, if you want a bankruptcy that's like having a funeral. Go hire somebody else to do it. Similarly, our firm doesn't do plea bargains in criminal cases. You hire our firm if you want a trial, not if you want to go make a deal and go to prison. So if—under those circumstances, I don't take those cases, either. I don't take bankruptcies, except for a Chapter Twelve. There are some times when a Chapter Twelve can be important, but even there, we do in our firm what is called the Tabletop Twelve. We go in and talk to the creditor. Since I'm the only one that gets to put in a plan in a Twelve, I get to say; look, here's what we'll do, and therefore, ordinarily, we don't even have to file a Twelve, if we are going to do a workout that way."

*Id.* 83:17–84–19.

Arens recalls communicating this information to the Battens. He could not recall any specific conversation with Miss Prudhomme. *Id.* 85:1–85:8. He denies having specifically requested the payment of the remaining retainer fee from the Battens and believes they sent it without being asked. *Id.* 108:7–108:16. He acknowledges that at the time of their initial con-

sultation, the Battens were in financial difficulty. *Id.* 85:6–85:15. Mr. Arens testified that:

"... Greg House wouldn't have the understanding to do the job, in my opinion, or to do the whole job without somebody guiding him."

Deposition, Arens, 121:12–121:14.

### C. Mr. Berry's Testimony

Mr. James Berry, Attorney of Rayville, Louisiana, testified on behalf of the Trustee as an expert witness in farm related bankruptcy matters. Mr. Berry was admitted to practice in Louisiana in 1971. From 1972–1973 he primarily handled farm real estate closings. As the economy declined in the mid–80's, he began to devote a substantial part of his time to bankruptcy. Since that time, that field comprises approximately 90% of his practice. He has had some experience with restructuring procedures under the Farm Credit System. He has been involved in approximately 70 confirmed Chapter 12 plans.

Mr. Berry testified that he was requested by the Trustee to review the records to determine if any benefit was rendered to the estate from the efforts of the Arens Firm. In addition to reviewing the case files, Mr. Berry reviewed the depositions of the various members of the Arens Firm. From that review, Mr. Berry opined that virtually no benefit to the estate was rendered.

FCB argues that the efforts of the Arens Firm were, in fact, harmful to the estates, rather than helpful. Memorandum, FCB, p. 23. This is borne out by the testimony of debtors and by the testimony of the expert witness.

Mr. Berry was further requested to express an opinion as to the adequacy of the representation. Mr. Berry stated that some of the attorneys had worked very diligently and produced some very capable "work product." However, he testified that the overall results were unsatisfactory both from the point of view of the estate and the debtors.

Mr. Berry also expressed the view that for a period of time following the filing, Miss Prudhomme may have been eligible for relief under Chapter 12.[7] Mr. Berry noted the advantages of a farm debtor proceeding under that Chapter. He testified that solicitation of voting was not required; therefore the confirmation process was less difficult. Mr. Berry noted that in Chapter 11, a large creditor such as FCB which is undersecured typically controls the case and frequently can prevent the confirmation of a plan. Mr. Berry also expressed the view that a Chapter 12 filing by a debtor having co-owned property might attempt to confirm a plan restructuring the entire debt. The only consequence to the non-debtor would be that no discharge would be received. In fact, Chapter 12 petitions were prepared but never filed by the Arens Firms. FCB Exh. 7.

Mr. Berry testified that, in his opinion, the retention of the contingency agreement was a matter that should have been disclosed to the Court as a part of the application process. In fact, such disclosure was mandatory. Mr. Berry testified that in his experience, the largest fee he had received in a Chapter 12 case was slightly over $17,000.00 in a case that took over two years to bring to confirmation. He has never received a fee of $75,000.00.

### III. Applicable Law

A. Scope of § 329 and F.R.B.P. 2017

11 U.S.C. § 329 provides as follows:

"(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with

the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) The estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment."

Rule Reference: 2014, 2016, 2017.

Bankruptcy Rule 2017(a) provides:

"**Payment or Transfer to Attorney Before Order for Relief.** On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive."

■ Subsection (a) of § 329 is derived from former Bankruptcy Rule 219(b) which required the attorney for a bankrupt to file a statement of the compensation paid or promised whether or not he applied for compensation. Section 329(b) empowers the bankruptcy court to cancel any agreement for compensation or to order the return of the unreasonable compensation to the entity that paid it. This section is derived from former Bankruptcy Rule 220, which, in turn, was based on § 60(d) of the Bankruptcy Act. *In re Rheuban*, 121 B.R. 368 (Bkrtcy.C.D.Cal.1990). In *Rheuban*, the Court noted that these provisions and

---

**7.** Mr. and Mrs. Batten's original bankruptcy case was dismissed due to their contingent liability on a claim. Miss Prudhomme's case was later dismissed without any such finding. It also should be noted that Mr. Royer, local counsel for Debtors, had some thoughts regarding the possible eligibility of Miss Prudhomme under Chapter 12. *See* Reasons for Decision, November 24, 1992, p. 5.

their predecessors implement a policy described by the Supreme Court, as follows:

"The manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services. [*citing Wood and Henderson*] We said in the case of [*In re*] *Wood and Henderson* [210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046] that the statute 'recognizes the temptation of a filing debtor to deal too liberally with his property in enabling counsel to protect him in the view of financial reverses in probable failure. It recognizes the right of such a debtor to have the aid and advice of counsel and, in contemplation of bankruptcy proceedings which will strip him of his property, to make provisions for *reasonable* compensation to his counsel." (Emphasis added).

*In re Rheuban,* 121 B.R. 368, 376, *citing Conrad, Rubin & Lesser v. Pender,* 289 U.S. 472, 476–477, 53 S.Ct. 703, 704–05, 77 L.Ed. 1327 (1933).

*Rheuban* also notes the *subjective* rather than *objective* nature of the "in contemplation of" bankruptcy test, again quoting the Supreme Court's decision in *Conrad:*

"... the controlling question is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction. [Citation] If the payment or transaction was thus motivated, it may be reexamined and its reasonableness be determined."

*Rheuban,* 121 B.R. 368, 378, *citing* 289 U.S. at 477, 53 S.Ct. at 705.

Where the principals in a business are concerned about its viability and that it cannot survive without additional capital, a merger, or a takeover, the rule of *Conrad* applies, even where there were "negotiations to prevent bankruptcy." *Matter of J.J. Bradley & Co., Inc.,* 6 B.R. 529 (Bankr.

E.D.N.Y.1980). "One may not specifically intend bankruptcy but rather desire extrication from financial difficulties through the efforts of an attorney." *In re: Lowell E. Indvik, et al., infra.*

B. What time limitations apply?

Although *Rheuban* holds that the "in connection with" language of § 329 permits the Court to review compensation paid any time after one year prior to the bankruptcy filing, it has been held that there is no statute of limitations for a § 329(b) motion. *In re Bennett,* 133 B.R. 374 (Bkrtcy. N.D.Tex.1991). That case also held that fraudulent concealment is a counterdefense to the statute of limitation defense, *Id., citing Matter of Placid Oil Co.,* 932 F.2d 394 (5th Cir.1991).

*Bennett* concerns the timeliness of an inquiry as to an undisclosed, *post-petition* transaction between debtor and debtor's counsel. What if the alleged undisclosed transfer occurred beyond the one year reach-back period under § 329(a)? In the case at bar, the payment of $50,000.00 was made more than one year prior to the filing of the instant cases.

In his memorandum, Arens notes and this Court agrees that there are no reported cases expanding the "lookback" in excess of one year. His memorandum purports to cite *Collier on Bankruptcy* § 329.9 in support of this agreement, which the memorandum asserts, reads as follows:

"The disclosure statement required under § 329 is not required if the payment or agreement was made more than one year before the date of filing of the petition. This temporal limitation was not found in prior law and represents a departure therefrom. It is apparently presumed that any compensation paid or promised prior to such time would *not* be for services rendered in contemplation of or in connection with a litigation or reorganization case."

Arens Memorandum, p. 5.

As astutely noted by FCB's counsel in its memorandum, there is no § 329.9 in the current edition of *Colliers.* There is, however, a similar statement at 329.03, which reads as follows:

"If, however, the payment or agreement was made more than one year before the date of the filing of the petition, then no such statement is required. This temporal limitation was not found in prior law and represents a departure therefrom. It is apparently presumed that any compensation paid or promised prior to such time would not be for services rendered in contemplation of or in connection with a liquidation or reorganization case."

*Collier on Bankruptcy,* Fifteenth Edition, § 329.03, p. 11.

■ Nothing in the foregoing suggests that any presumption cannot be rebutted. Bankruptcy courts are not limited to the one-year period when there is fraud on the Court or the estate whether such fraud occurred pre-or post-petition.

The discharge of a debtor may be denied under 11 U.S.C. § 727(a)(2)(A) when concealment occurred substantially before the one year period just prior to filing. In *In re Olivier,* 819 F.2d 550 (5th Cir.1987) the Court observed:

"On its face, section 727(a)(2)(A) addresses only transfers or concealment of property occurring within a year before bankruptcy. Here the purported transfer by appellants occurred more than a year before bankruptcy, but appellants continued the concealment of their secretly retained interest in the property. The courts below relied on the well-settled doctrine that in this character of situation the concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy and, therefore, that such concealment is within the reach of section 727(a)(2)(A).

The doctrine of continuing concealment developed and was followed under predecessor provisions of the bankruptcy laws and continues to be followed in more contemporary decisions. Recognizing that we have not heretofore addressed whether the continuing concealment doctrine will be followed within this Circuit in discharge cases involving 11 U.S.C. § (a)(2)(A), we now hold that it may be appropriate applied to such cases."

819 F.2d 550, 554–555 (footnotes omitted). *See also In re Sanders,* 128 B.R. 963 (Bkrtcy.W.D.La.1991), and cases cited therein.

The policies favoring the application of the doctrine of continuing concealment to the denial of the discharge would similarly apply to the concealment by debtors' attorneys of money or other assets of those acting in contemplation of bankruptcy. *Rheuban, Conrad, supra.*

FCB maintains that there is a state law basis to disregard the one year period under § 329. FCB asserts that the Arens Firm is barred, should the period be deemed prescriptive in nature, from asserting it under the doctrine of *contra non valentem agere non currit prescriptio.* FCB's argument is contained at pages 38–40 of its Memorandum, *citing, inter alia, Bennett, supra.* Since this Court determines that federal law applies, it declines to address the state law theory, which is similar to, if not identical with the theory adopted in these reasons.

FCB further maintains that the Arens Firm's contention that its engagement was not within the purview of § 329 judicially estops it from asserting the statute as a bar. In support of this theory, FCB argues that if the firm's position that its employment is not covered under § 329 were correct, then the firm must have been employed as "... special litigation counsel, or something roughly analogous, under 11 USC § 327(a)." Memorandum, FCB, p. 42. That section, FCB notes, has no limitation period. In any event, FCB argues, the firm cannot be heard to "accept any benefit that the one-year period of 11 USC § 329(a) might afford while denying that it is subject to disgorgement under that statute." *Id.* p. 43. This proposition is correct.

### C. Factors Considered for Approval of Attorney's Fees

■ In making a determination of attorney fees, the Court must consider the factors announced by the Fifth Circuit in *Matter of First Colonial Corp. of America,* 544 F.2d 1291 (5th Cir.1977) and *Johnson v.*

*Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). These requirements are incorporated into the Local Rules. *See Local Bankruptcy Rules,* 2.13. It is well-settled that the applicant bears the burden of proof in a fee application. *Matter of U.S. Golf Corp.,* 639 F.2d 1197 (5th Cir.1981); *Matter of Evangeline Refining Co.,* 890 F.2d 1312 (5th Cir.1989). Among the factors relating to the quality of the representation are the skill of counsel and efficiency in handling the case.

■■■ Attorneys are not entitled to compensation from estate funds unless the services rendered benefit the estate. *Bennett, supra; In re Grabill Corp.,* 110 B.R. 356, 359 (Bankr.N.D.Ill.1990). An attorney is not a guarantor of the confirmation of a plan as a prerequisite to the entitlement to compensation. *In re James Contracting Group., Inc.,* 120 B.R. 868 (Bkrtcy. N.D.Ohio 1990). Even where the source of the compensation is not the estate, the bankruptcy court has jurisdiction over same and the right to determine the reasonableness of the compensation. *In re Southern Industrial Banking Corp.,* 41 B.R. 606 (Bankr.E.D.Tenn.1984); *In re Furniture Corporation of America,* 34 B.R. 46 (Bankr.S.D.Fla.1983).

■■■ The requirement of disinterestedness/no adverse interest is a pre-requisite to the payment of compensation to counsel for a debtor-in-possession. A "disinterested person" is defined in the Code at 11 U.S.C. § 101(14) as follows:

> " 'entity' includes person, estate, trust, governmental unit and United States Trustee.' "

■■■ The burden of disclosure rests with the applicant. *In re Huddleston,* 120 B.R. 399 (Bankr.E.D.Tex.1990); *In re Peoples Savings Corp.,* 114 B.R. 151 (Bankr. N.D.Ill.1990); *In re Plaza Hotel Corp.,* 111 B.R. 882 (Bankr.E.D.Cal.1990). The decision of whether a connection with the debtor disqualifies the applicant is to be made by the Court, not the applicant, "... whose judgment may be clouded by the benefits of the potential employment." *In re Lee,* 94 B.R. 172, 176 (Bankr.C.D.Cal.1989). Disclosure is a continuing responsibility.

If potential conflicts arise after approval of the application, the professional must advise the Court. *See, e.g., Cropper Company,* 35 B.R. 625, 630 (Bkrtcy.1983); *In re Central Ice Cream Company,* 59 B.R. 476 (Bankr.N.D.Ill.1986); *In re ESM Government Secur., Inc.,* 66 B.R. 82, 84 (S.D.Fla. 1986). The Court may disallow all fees or compensation to a law firm which does not meet this prerequisite. *In re Grabill Corp.,* 113 B.R. 966 (Bankr.N.D.Ill.1990), *citing Woods v. City National Bank and Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941).

### D. Retainers

The majority rule holds that a pre-petition retainer becomes property of the estate upon filing and cannot be used by the attorney until a fee request is first approved by the bankruptcy court. *See e.g., In re Kendavis Industries Intern., Inc.,* 91 B.R. 742 (Bankr.N.D.Tex.1988); *In re Chapel Gate Apartments, Ltd.,* 64 B.R. 569 (Bankr N.D.Tex.1986). The minority view is that the debtor's attorney is free to use the retainer without court approval. The leading opinion espousing the minority view is *In re McDonald Bros. Const., Inc.,* 114 B.R. 989 (Bankr.N.D.Ill.1990).

This latter view does not avail the Louisiana practitioner. *See* Code of Prof.Resp., DR 9–102(A); State Bar Articles of Incorporation, Art. 16; Rules of Prof. Conduct, Rule 1.15. LSA–R.S. Foll. 37:219. *Louisiana State Bar Ass'n v. Williams,* 512 So.2d 404 (La.1987). *Louisiana State Bar Ass'n v. Kilgarlin,* 550 So.2d 600 (La.1989). Arens argues that the type of fixed fee retainer at issue here is permissible in Arkansas and that state's law should apply. Memorandum, page 9. This Court disagrees. The Rules of Professional Conduct of the Louisiana State Bar Association have been adopted by the United States District Courts for Louisiana. Uniform District Court Rule 20.04. The District Court rules apply to proceedings in the Bankruptcy Courts for the Western District of Louisiana. Local Bankruptcy Rule 1.2.

## IV. A Pattern Emerges

### A. Stoppel

This case is not the first time that the Arens Law Firm's fees have come under the scrutiny of the courts. In *John Arens and Richard Alexander, Appellants v. The Committee on Professional Conduct of the Supreme Court of Arkansas, Appellee*, 307 Ark. 308, 820 S.W.2d 263 (1991), (hereinafter *"Stoppel"*) the firm appealed the issuance of letters of caution by the Committee on Professional Conduct. There, Leon and Marcie Stoppel operated a 7000 acre farm in Kansas. They owed $1,000,000 to the Production Credit Association and a similar amount to the Federal Land Bank. They had filed bankruptcy petitions under Chapter 11 and Chapter 12. The lenders sought to foreclose. Mr. Stoppel had learned of John Arens' reputation in the field of agricultural loans and lender liability. While Arens was at a seminar in Kansas, Mr. Stoppel contacted him. In the Spring of 1988, Mr. Stoppel went to Fayetteville, Arkansas to see Arens. In July, 1988, the firm was employed to represent the Stoppels. The latter claimed that the firm was to endeavor to have the farm loans restructured and pursue lender liability claims against the lenders. A retainer of $60,000.00 was paid. The contract described same as a non-refundable retainer.

The Stoppels agreed to pay an additional amount on the following contingency basis:

> "It is our understanding that if any recovery is made over and above debt restructure or reduction, that our expenses, including the above retainer, and your firm's out-of-pocket expenses, will be paid. Only thereafter will any net recovery be shared on a sixty percent (60%) to us and forty percent (40%) to your firm basis."

820 S.W.2d 263, 264.

Noting the requirement that a fee be reasonable, and the difficulty of the case, the skill required, the exclusion of other employment, the eminent foreclosure, and other factors similar to *First Colonial, supra*, the *Stoppel* Court noted that the fact the fee was high did not make it *per se* unreasonable. However, it noted that a retainer charge becomes excessive if the services are never performed. The Committee of Professional Responsibility found that the attorneys did not perform the services. The Supreme Court of Arkansas affirmed that decision, based on the conclusion it was not clearly erroneous.

The Court noted that the firm did obtain injunctive relief on behalf of the Stoppels, but the proceeding was later dismissed. Those efforts took little time. The Stoppels began to experience difficulty in having their phone calls to the firm returned. On April 20, 1989, eight months after the firm's employment, a lender liability action was filed. It was dismissed by the district court on September 26, 1989, for failure to state a claim on which relief could be granted. The court concluded there was no private right of action under the Agricultural Credit Act of 1987. *Stoppel v. Farm Credit Bank of Wichita*, No. 89–1221–C, 1989 WL 116012 (D.Kan. Sept. 26, 1989), Exhibit B, FCB memorandum.

In October of 1989, the Stoppels returned to Fayetteville. After a meeting, they decided not to appeal and to wait and see if Congress included a private right of action in the Farm Credit Act of 1990. The firm represented that it had friends in Congress. In the Court's words, "Nothing came of this...." 820 S.W.2d 263, 265.

The Stoppels were insistent that their suit be filed and were assured it would be filed around January 1, 1990. Mr. Alexander assured them it would not be difficult to file since the state court law suit would involve claims that were similar to those previously raised in the federal action. Efforts by the Stoppels to contact the attorneys by phone were unsuccessful.

In late January, 1990, the Stoppels went to Fayetteville again. Arens advised them he would have to see who had the file. He threatened to fire the attorney, a Mr. Linzay. The Stoppels advised both Arens and Alexander they had lost confidence. Arens denied they were due any money from the firm. The Stoppels returned to Kansas empty-handed. A secretary later called them. Mr. Stoppel testified he demanded the files and an accounting of their money.

They followed this request by letter, complaining of being "shuffled and re-shuffled" among various members of the firm, again requesting the files and an accounting.

The state court action was never filed. The firm was discharged. After that event, the Stoppels received a complaint prepared by the firm for filing in the state courts. It was essentially the same as the prior federal complaint with the caption changed. A Kansas attorney consulted by the Stoppels declined to file the document. Another request to the firm for an accounting and their files went unanswered. A complaint was filed with the committee.

Afterwards, the firm responded with the claim that 12 attorneys had expended in excess of 1100 hours on the case. Regular time sheets were not kept. The committee particularly expressed its disbelief as to the 600 to 700 hours allegedly spent for researching and filing one complaint. The firm was sanctioned by the Committee, which found that "the fee was not 'reasonably commensurate with the circumstances.'" 820 S.W.2d 263, 266.

### B. *Hale*

The Arens Firm's fees have not escaped the attention of the bankruptcy courts. In a case arising in the Western District of Missouri, *In re Joseph Hale*, No. 87–04373–S–1–11, the Trustee filed an adversary complaint against John F. Arens and Arens & Alexander under Adv. No. 90–6085–S–11. The Complaint, FCB Exh. 13, asserts that defendants received a fee from the debtors for representation in the bankruptcy and related proceedings of $38,000.00 paid by State Financial Corporation. The source of the funds was alleged to be "... the proceeds of a loan allegedly made by State Financial Corp. to Hales' daughters, but the loan was, in fact, a sham and an attempt to conceal the fact that the money was being loaned or given to the Hales in consideration of cattle and land lease transactions between the Hales and Kenneth Murdette, the principal shareholder of State Financial Corp." Complaint, Article 3. This transaction allegedly violated § 329. The trustee sought recovery of the funds as property of the estate.

Defendants filed an answer asserting various defenses. FCB Exh. 14. The matter came on for trial on July 1, 1991, on the defendant's motion for summary judgment. The Honorable Karen M. See, United States Bankruptcy Judge for the Western District of Missouri made, *inter alia*, the following findings and conclusions:

\* \* \* \* \* \*

"20. At the first meeting of creditors in the Chapter 7, Arens & Alexander refused to disclose the receipt of the $38,000.00 and in a subsequent pleading and affidavit they sought to have the court keep the information as to the $38,-000.00 'under seal'.... They claimed that the facts surrounding the payment of the fee were 'privileged' and that they were appearing pro bono in the bankruptcy proceedings.

21. In his deposition testimony, defendant John F. Arens reaffirmed the 'pro bono' assertion and testified that none of the $38,000.00 was to be used for the bankruptcy proceedings. Nevertheless, after taking the $38,000.00, Arens & Alexander represented Joe and Eva Hale in at least two bankruptcy proceedings, one resulting in the order filed April 12, 1990, assessing damages for violation of the automatic stay ...; and the other being the adversary action concerning the Thomas Graves estate (Adv. no. 89–6059) which case was tried in this court and subsequently appealed through the District Court to the Eighth Circuit Court of Appeals.... [8]

22. Defendants John F. Arens and Arens and Alexander violated section 329 of the Bankruptcy Code by failing to initially file a statement of compensation and, further, violated the spirit if not the letter of said section and Bankruptcy Rule 2016 by resisting disclosure without any reasonable grounds therefor.

23. The Court is authorized under sections 329 and 543 of the Bankruptcy

---

8. *See In re Joseph Herman Hale, et al,* 980 F.2d 1176 (8th Cir.1992).

Code and Rule 2017 to order the return of the $38,000.00."

Judgment, *Hale, Thomas J. Carlson, Trustee, Plaintiff vs John F. Arens and Arens and Alexander*, FCB Exh. 15.

### C. *Indvik*

In yet two other bankruptcy cases, arising in the Northern District of Iowa, *In re Lowell E. Indvik and Melva Indvik, Debtors*, No. X88–0247M, and *In re Eldon Indvik*, No. X88–01246M, the reasonableness of the fees of the Arens Firm were again scrutinized. In September of 1990, the Court first determined whether a retainer paid the Arens firm constituted compensation under § 328 and whether it could be examined under § 329. FCB Exh. 19, *"Indvik 1."*

The Court noted that the Indviks first learned of the Arens Firm at a seminar. Bankruptcy cases were already pending on their behalf. Arens suggested the debtors explore non-bankruptcy solutions. A retention letter was signed which is similar to the letter in the instant case and in *Stoppel*. A total of $50,000.00 was paid as a retainer. Debtors original bankruptcies were dismissed without an appearance by the Arens Firm. Minimal services were performed prior to the dismissal.

Disclosure of compensation forms were filed in each case reading as follows:

> "The undersigned states that he is attorney for the debtor and that the total compensation paid or promised (if such payment or agreement was made after one year before the date of the filing of the petition in this case) for services rendered or to be rendered in this case is as follows:

Paid: –0–
Promised: Hourly Fees & Expenses
Total: Hourly Fees & Expenses, the Source of Such Compensation Paid or Promised is: Unencumbered Assets of the Estate."

*Indvik 1*, p. 8.

After a lengthy examination of the circumstances surrounding the payment of the retainer, the Court concluded that the payment was not made to file a bankruptcy case or cases and thus was not subject to review under § 328. However, the Court determined that it was subject to review under § 329, even though at the time of retention the debtors did not specifically intend another bankruptcy filing. Instead, the Court noted that the firm was intended to "negotiate or litigate the Indvik's financial difficulties. The work of Arens & Alexander was intended to prevent their financial destruction." *Indvik 1*, p. 16.

Having determined that examination was permissible under § 329, the *Indvik* Court considered the reasonableness of the compensation and filed a second ruling on June 24, 1991, (*"Indvik 2"*).

The Court noted that the firm adopted a retainer fee approach "... because its experience in the agricultural law field led it to believe that the attorney/client relationship was more often than not 'poisoned' when inevitably during the course of litigation, the farmer/client lost the financial ability to pay ongoing fee obligations. The method, according to the firm, allowed it to fully and zealously represent the client without the detraction of the client's later financial problems." *Id.*, p. 4.

The Court discussed the representation of the debtors after the dismissal of the original cases. The firm began to deal with debtors' five creditors, including FmHA (Farmers Home Administration).

These efforts were not totally unsuccessful, but Debtors re-filed bankruptcy in 1988 while represented by the Arens firm, which was later discharged. The court was asked to consider a refund of the retainer.

On the issue of the reasonableness of debtors' pre-bankruptcy compensation of the Arens & Alexander Firm based on 11 U.S.C. § 329(b), the firm argued: (1) the reasonableness should be examined from the perspective of the parties at the time of the agreement, (2) if some refund was due,

the firm was entitled to an administrative expense claim, and (3) to the extent the entire fee was not allowed, the firm should be allowed to file a proof of claim as an unsecured creditor. The firm submitted time sheets reflecting services in connection with both the dismissed cases and the later cases.

The Court determined that it need not decide whether the retainer was non-refundable, but it doubted that a non-refundable provision was enforceable in Iowa. *Id.* p. 10. The Court analyzed the services separately as to each of the five creditors. It found that the reasonable fees and expenses pertaining to same were $28,425.30. The balance of the retainer of $21,574.70 was held to be excessive. The firm sought to have that amount applied to the unpaid balance of its bankruptcy fees which exceeded $32,000.00. The Court noted that the firm had never applied for appointment as counsel and did not seek retroactive approval. The Court allowed compensation retroactive at $13,579.27 and authorized the firm to offset it against the portion of the retainer held to be excessive. A total of $7,995.43 was ordered turned over to the trustees of the Indviks' estates.

### D. *Burke*

In an opinion filed December 7, 1992, the United States Bankruptcy Court for the Northern District of Oklahoma took members of the Arens Firm to task on the application of the Trustee to review debtors' transactions with their attorneys. In that matter, the debtors took over a dairy farm in 1987. Prior to that date, Mr. Burke had dealt in some other "obscure" operations, including, as a sideline, a trash hauling business. They leased part of the property and purchased additional property. One of their lessors was a Mrs. Brown. The business was not successful. By 1988 they were in financial difficulty which they attempted to remedy by selling cattle without "... regard to whose collateral the animals might be ... and without accounting for the proceeds." *In re Burke,* 147 B.R. 787, 790 (Bkrtcy.N.D.Okl.1992). Suits were filed and at least one judgment entered.

The debtors sold a separate enterprise for cash. Shortly thereafter they consulted the Arens Firm and executed a letter which, like the other cases, contained language concerning a non-refundable retainer. In this instance, $20,000.00 was paid. A petition was filed under Chapter 12 on December 20, 1988. Ms. Zelinski filed an application for admission *pro hac vice* and was admitted. Mr. Nixon, another member of the Arens Firm, filed a Disclosure of Compensation which reflected a payment of $7500.00 allegedly from the sale of unencumbered assets on a pre-printed form which did not contain the statutorily mandated language. Debtors' own statement of affairs reflected the payment of $20,000.00. The case proceeded routinely, with the § 341(a) meeting and an adversary proceeding taking place without incident. However, things were worsening on the farm. In the Court's words:

> "Meanwhile, debtors' cattle were dying of starvation and exposure. On about February 20, Mrs. Brown complained to the sheriff about the condition of her neighbor's cattle. On February 22, FmHA's agent ... visited debtors' farm. He saw a dozen cows and calves dead or dying. The rest stood outdoors in frozen mud, 'emaciated and starving.' .... Gregory fetched a veterinarian ... [who] determined that the animals still living were 'extremely emaciated and weak ... in a severe state of emaciation and malnutrition.' .... He saw calves eating their own excrement. Others nibbled at his clothes."

*Id.* pp. 6–7.

FmHA sought the immediate turnover of the cattle, which was obtained. Gruesome scenes relating to the attempted rescue are set forth in the opinion. Mr. Burke was quoted in a newspaper accusing FmHA of trying to steal his cattle. After a hearing, debtors were removed as debtors-in-possession.

Mr. Nixon amended the disclosure of compensation. Again hedging, this document admitted to the receipt of $17,500.00. Finally, on March 9, 1989, application for approval of appointment as attorneys for

debtors was sought for the first time. The application did not seek *nunc pro tunc* approval and it was never granted. Having noted the discrepancies the trustee sought review.

A plan was filed followed by an amended plan. Ultimately, the Court concluded that debtors were not properly in a Chapter 12. The case was converted to a Chapter 7. That order was appealed. The appeal was dismissed. Debtors did not pay the trustee an agreed payment of $300.00 which had resulted from a settlement of an exemption issue.

In response to the trustee's request for review, the Arens Firm sought approval of compensation in the amount of $54,393.75 and expenses of $4,641.31, against which it would credit the retainer.

In the meantime, "[w]hen last heard of by th[e] ... Court, debtors were living in a state of demoralized squalor. The Burkes' dogs starved to death on their leashes." *Id.* p. 13.

The Arens Firm was directed to escrow $10,000.00 of the retainer of August 4, 1989. Slightly later, Nixon sought to withdraw as counsel, alleging he was no longer employed by the firm, and other attorneys would take over.[9] No other appearances were made, but Ms. Zelinski had previously been admitted. More pleadings were filed relating to the Arens Firm's services. One firm attorney expended 19.75 hours answering a complaint and getting an extension of time to answer another.

Ultimately, the Court, after a hearing, determined that no compensation whatsoever was due under § 330(a). It then considered whether compensation should be approved under § 327(a), *nunc pro tunc.*

The Court ultimately allowed the firm to retain the $10,000.00 which was not escrowed, but directed the return of the entire escrowed amounts to the trustee. The Court observed:

"The results in this case were hideous. This reorganization did not merely fail—

it was put out of its misery, amid scenes of unconscionable brutality. A & A beg this Court not to punish them merely because their clients did not take their advice. This Court will not punish any attorney merely because his client refused to take his advice. But that is not the problem here. A & A's own activities contributed to the ruination of debtors' farm and the mistreatment of debtors' animals.

Debtors' feed bins blew over in August, 1988. At about the same time, debtors were sued for bouncing checks for cattle feed, and came to fear criminal prosecution for the same. For these reasons, they consulted A & A. A & A expected to put debtors in reorganization proceedings, and commenced activities toward that end. But first, A & A demanded a $20,000.00 cash gift from debtors. To provide it, debtors consumed their last remaining unencumbered asset of any value, and emptied their bank account. It is not surprising that debtors' cattle spent the next few months starving: debtors had no feed for them, and nothing to buy feed with; their last resources had gone to pay their attorneys, for work that had not yet been done and might never be done. When debtors suggested selling some of the cattle to pay for upkeep of the rest, their own attorneys discouraged them. Next, A & A ran up fees of $3000, for having a $150–per–hour attorney putter with a few collection suits which would be stayed anyway by the filing of bankruptcy; over $6,000 more, for having two agricultural experts bustle about a farm full of starving animals and immobilized machinery, noting sagely that something was amiss; and almost $3,000 more, for collecting inaccurate information for schedules that would be filed late in a 'farm reorganization' case which now had no prospect of success.

There is something unreal in such a spectacle. For purposes of this opinion, this Court will presume that A & A actu-

---

**9.** An allegation that is strikingly similar to one made by Mr. Bell in the instant case. *See* Motion to Withdraw, filed August 21, 1992.

ally spent the time indicated in their billing records. But if such time was really spent, then it was spent most unreasonably. A & A's activities bore no rational relation to debtors' actual situation, capabilities or prospects. As the first step in the 'reorganization' which they were going to conduct, A & A broke these debtors. The things that followed—the starvation of debtors' animals, the deterioration of debtors' machinery, the recovery of property by secured creditors, the failure of the plan and conversion of the case, debtors' demoralization and destitution—were all consequences of debtors' lack of cash at a crucial time. This lack of cash was A & A's own doing. Is this the kind of 'help' offered by reorganization? If it is, all parties would seem too be better off without it—all except A & A themselves."

*Id.* pp. 24–26.

## ANALYSIS

### *I. Was there Full Disclosure?*

At no time, in any of the applications to enroll, was it disclosed that the Arens Firm received payment of sums totalling $75,000.00. This sum was made in two payments; the first on February 26, 1990, by check issued by "Riverside Farms Partnership" in the amount of $50,000.00, the second by a similar check dated February 27, 1991, for $25,000.00. Nor was it disclosed in the application process that the Arens Firm retained a contingent fee interest in State Court litigation filed on behalf of the debtors against FCB. On January 15, 1992, a "Petition for Damages" was filed on behalf of the Debtors "individually and as Debtors–in–Possession in the Bankruptcy Estates captioned In re: Daisy Prudhomme, Debtor No. 91–81053 Chapter 11, and In re: John and Kathleen Batten, Debtors No. 91–81334 Chapter 11 ..." against the Farm Credit Bank under Docket No. 63888 B in the Tenth Judicial District Court for Natchitoches Parish, Louisiana. UST Exh. 9.

The retainer agreement between the debtors and the Arens Firm is dated February 26, 1990. The terms of the retainer agreement between the debtors and the Arens Firm are virtually identical to the arrangements in *Stoppel.* No mention of bankruptcy is made in the retention letter. Response to Motion for Disgorgement of Retainer, Attachment.

The Statement of Financial Affairs filed in the Prudhomme case on August 14, 1991, UST Exh. 2, acknowledges that debtor consulted, *inter alia,* the Arens Firm within the year prior to filing. It reflects the payment of $25,000.00 to the firm on February 27, 1991. The contingent fee arrangement is not listed.

Local Bankruptcy Rule 4.0 requires that, in addition to compliance with Rule 2014, all applications for appointment of counsel for Chapter 11 debtors must also include answers to Supplemental Schedules. Among the questions set forth therein is the following:

"9. List all circumstances under which proposed counsel or proposed counsel's law firm has represented any affiliate during the past 18 months. List any position other than legal counsel which proposed counsel holds in either the debtor or affiliate including corporate officer, director, or employee. List any amount owed by the debtor or the affiliate to proposed counsel or counsel's law firm at the time of filing, and also amounts paid within 18 months before filing."

This rule would have encompassed both payments made by debtors, irrespective of 11 U.S.C. § 329 or Rule 2016.

No Supplemental Schedules were filed in the Prudhomme case. In the Batten case, the Supplemental Schedules were filed on November 7, 1991. The first two inquiries of question 9 are answered by responses of "None." The amounts owed are described as follows: "No amount owed at time of filing. $25,000. paid to Arens and Alexander in February, 1991." UST Exh. 13.

The retention of the contingent fee is not disclosed in the schedules, statements, or any of the disclosure statements filed in these cases other than the Second Amended Disclosure Statement filed in the Batten

case on October 28, 1992. In that filing, the interest is described as follows:

*"Anticipated Future Litigation*

The Debtors listed three lawsuits on their bankruptcy schedules as follows: *Farm Credit Bank of Texas v. Kathleen P. Batten, et al,* State of Louisiana, 10th Judicial Circuit [sic], Natchitoches Parish, Cases No. 62–523–A, 62–524–A and 62–525–A. The Debtor as Debtor–in–Possession, will take any action which becomes necessary in any of these lawsuits.

The Debtors listed a cause of action against the Farm Credit Bank of Texas on their bankruptcy schedules. This cause of action is based on the Debtors' belief that the Farm Credit Bank did not deal with them in good faith in considering any of the restructuring proposals submitted. They are currently pursuing this cause of action, as Debtors–in–Possession in Louisiana state court, as follows: *Kathleen P. Batten et al v. Farm Credit Bank of Texas,* No. 63–788–B, State of Louisiana, 10th Judicial Circuit [sic], Natchitoches Parish. Farm Credit Bank of Texas removed this case to federal district court alleging a federal claim and diversity. Debtors believe that this case will be remanded to state court after notice and hearing on the matter. Regardless of where the action is pursued, Debtors believe that it will be highly contested and will result in a trial of the issues involved.

Debtors value this cause of action at $750,000. All legal fees for pursuing this cause of action have been paid, with the exception of a contingency contract with Arens Law Firm for 40% of any affirmative recovery made in the lawsuit. This contingency contract with the Arens Law Firm was executed on the 26th day of February, 1990, and is an executory contract that has been accepted by the Debtors under the plan...."

Second Amended Disclosure Statement, pp. 20–21.

In his memorandum, Arens argues as follows:

"The Trustee apparently misunderstands the contingent fee arrangement between the Firm and the Debtors. The Firm only shares if any recovery is made ... over and above debt adjustment or satisfaction. In the Farm Credit Bank case, in order for the Firm to recognize any benefit from its contingency agreement, the recovery would have to exceed the debt to the Farm Credit Bank, which was estimated on October 29, 1991 in the Statement of Financial Affairs and Schedule of Assets and Liabilities filed by the Debtors to be $1,551,674.00. In addition, before the Firm would share any recovery over and above this amount, the Battens' and Ms. Prudhomme's expenses, including the retainer of $75,000, would be deducted and returned to the Battens. Only thereafter would the Firm share in 40 percent of any affirmative recovery. The Trustee has cited the Court to no cases which have held that a debtor's attorney who operates under a contingency agreement in pursuing a debtor's cause of action has a conflict of interest. The characterizations that 'the debtors' attorneys own 40 percent of a lender liability suit is a mischaracterization. The Firm does not own any part of the lender liability suit: it belonged to the Battens. The Firm would only share in any net recovery over and above the approximate $1,625,000 debt and retainer."

Memorandum, Page 12.

■ This argument is mere sophistry. It is the failure to disclose the interest, whatever the nature of same, not its ultimate worth, that disqualifies the firm. The Court, not counsel, makes the decision whether disqualification is required. *In re Lee, supra.*

## II. Was the Arens Firm Employed in Connection with a Proposed Bankruptcy?

■ Given, *inter alia,* the financial difficulties encountered by the Debtors at the time of the consultation of the Arens Firm, the threat communicated by Alexander shortly after employment (FCB Exh. 11),

this Court concludes that pursuant to the case law, *supra,* the payments to the Arens firm totalling $75,000.00, were made in contemplation of bankruptcy. Debtors were in desperate financial straits at the time of consulting the Arens Firm. They had been unsuccessful in their restructuring efforts. They were pessimistic about their changes on appeal. Their business could not survive without new capital. A merger or takeover were not realistic possibilities. Extrication from financial difficulties was urgently needed.

John Arens' repeated disclaimers of the firm's involvement in Chapter 11 bankruptcy matters does not change this result. Arens misrepresents the firm's involvement in Chapter 11 cases. The firm's involvement in the *Hale* and *Indvik* cases is noted at length, *supra.* The *Hale* matter was filed as a Chapter 11 bankruptcy on February 8, 1992. Ms. Zelinski participated in the *Indvik* and *Burke* cases, *supra,* and in cases in Oklahoma, Illinois, and Arkansas. Deposition, Zelinski, 16:17–19.38.

Having concluded that the payments were made in contemplation of bankruptcy, and that there is no time-bar applicable to this Court's examination, these Reasons now turn to the issue of whether such compensation was excessive.

### III. Was the Compensation Paid Excessive?

In the Reasons regarding Mr. Royer's application, this Court noted the impossibility of comparing his time entries with the then non-existent time sheets of the Arens firm. This Court also noted that approval of the application would serve no useful purpose, since the payment of the same would be time-barred pursuant to the plan. *See* Reasons for Decision, November 24, 1992, p. 4, fn. 4.

Now, however, Arens has filed the documents attached to his memorandum asserting that over 384 hours were expended on behalf of the debtors in these cases and that this is only a partial estimate. Further, the attachments include Arens own affidavit containing his version of various reported cases.

Both the United States Trustee and FCB assert that the affidavits are inadmissible hearsay. This Court agrees. *See Federal Rule of Evidence* 801, 802; *United States v. Glass,* 744 F.2d 460 (5th Cir. 1984); *United States v. Stone,* 604 F.2d 922 (5th Cir.1979).

Assuming *arguendo* that these documents are properly before the Court, this Court's review of the same leads it to the same conclusion expressed by a number of bankruptcy courts, *supra,* that the firms' time estimates are over-estimated or, if accurate, were not justifiable. The estimates further evoke the disbelief expressed by the Supreme Court of Arkansas in *Stoppel.*

The filing is itself belated, made in the form of an attachment to a memorandum which is, in itself, late-filed. The filing totally fails to address the various factors relative to the quality of the representation required by the *Johnson* and *First Colonial Cases, supra. See Local Bankruptcy Rule 2.13(A).* No effort is made to include the data required in substantiation of a fee application required by the local rules nor is there even a minimal effort to file same in the prescribed format. Local Bankruptcy Rule 2.13(B). No benefit is demonstrated to the estate.

The "Recap" totals do not match the totals shown on the "Consolidated Summary" for two of the attorneys. Mr. House's time has been increased by 1.45 hours without explanation. Ms. Zelinski's time has been increased by 37.40 hours without explanation. The suggestion that the attachments represent "billing" records is completely at odds with Arens oft-stated position that he never billed a farmer. Deposition, Arens, 30:6–30:7. The debtors testified they received no bills.

Any time sheet alleged to have been prepared by Mr. Bell is particularly suspect. Bell acknowledged in his deposition that he did not keep regular time sheets and, at best, kept them on a "hit or miss basis." Deposition Bell, 47:5 and 24–25, 48:4 and 7–9. Although Bell encouraged others to keep time sheets, in his own words, he was

".:. an abject violator of his own direction." Deposition, Bell, 51:10.

The suggestion that Mr. House spent almost 156 hours on these cases is absurd. This Court has already noted that Mr. House could or would not make the necessary changes to the disclosure statements in a timely fashion, despite his repeated assurances. *See* Reasons for Decision, *Batten*, June 10, 1992, p. 4. Arens himself acknowledges House's lack of expertise.

In short, Arens has failed to bear the burden of proof with regard to any claim for fees in these bankruptcy cases. *U.S. Golf, Evangeline Refining, supra.* This Court concludes that the representation of the debtors by the Arens Firm does not justify any payment at all, much less the amount paid. This Court concludes that not only were the fees paid in contemplation of bankruptcy, the retainer was excessive, given the lack of benefit to the estate and the results obtained. The situation here is distinguishable from the facts in this Court's Reasons for Decision on Mr. Royer's application. There, Counsel's efforts in the case were in the early stages, during a period of uncertainty in the case law. Also, the retention of local counsel protects an interest of the Court. Mr. Royer maintained detailed time sheets of his efforts in the case.

To the extent that Arens attempts to justify the retention of the payment of $75,000 on the claim that the services in the state court litigation fully expended same, this argument also fails. Whatever efforts may have occurred in the State Court relating to enjoining the foreclosure by the Farm Credit Bank did not avail the debtors. The plans which were confirmed ultimately divested the debtors of their properties. The lender liability action resulted in no benefit to the debtors or the estate; the action has been dismissed based on FCB's plans.

It would be virtually impossible to justify a $75,000.00 fee in the state court litigation on the affidavits submitted (assuming again, *arguendo*, that the Court may even review them). Ms. Corley's affidavit provides no time estimates. Mr. Alexander estimates his own time in segments which total between 92 and 108 hours. To justify a $75,000 fee on this showing would require that Alexander's time be compensated at an hourly rate in excess of $600.00. Much of the efforts in the state courts relate to injunctions obtained against FCB. This effort was essentially time wasted, inasmuch as the bankruptcy stay ultimately stayed foreclosure.

### IV. The Quality of Representation

■ Even had the Arens Firm demonstrated some success in the instant cases, other factors that must be considered relate to the quality of the representation. Among the list of "extraordinary circumstances" [*See First Colonial, Johnson, supra*] required to be discussed in an application for attorneys' fees is the skill of counsel. The Court should consider:

"(1) Whether the debtor was thoroughly interviewed prior to filing;

(2) Whether schedules and pleadings are accurate, complete, and professional;

(3) The efficiency with which the case was conducted;

(4) Whether counsel has been diligent within the rules of professional responsibility to assure that his client fulfills his statutory duties and his duties imposed by the Court order;

(5) Whether counsel has fully discharged his ethical responsibilities to this clients and his professional responsibility to the Court;

(6) Whether Counsel has promptly attended all hearings and has professionally represented his client at those hearings."

Local Bankruptcy Rules, Rule 2.13.

FCB argues that the practice of the Arens Firm raises serious issues of the competency of its attorneys. In fact, FCB argues that members of the firm committed malpractice. FCB Memorandum, p. 3. Indeed, the letter from John Arens to the Debtors, UST, Exh. 1, a copy of which is attached hereto as an Exhibit, is essentially an apology. Mr. Arens testified that Mr.

House lacked the "understanding" to do the job alone, *supra.* Mr. House played a pivotal role in these cases.

FCB cites a laundry list of cases relating to the Arens Firm's reputation, suggesting that results it obtained in non-bankruptcy forums do not justify confidence. These cases are discussed at pages 11–15 of FCB's memorandum. Presumably, these citations aroused Arens to file the Motion to Strike. Arens further gives his own interpretation of these and other cases in which he was involved in his own inadmissible affidavit. This Court declines to enter this name-calling contest. Whether FCB is engaged in a personal vendetta against Arens, as he maintains, is irrelevant to the case at bar. Arens, as it has been noted *supra,* is hardly an admirer of FCB. It is sufficient to observe that *Hale, Indvik,* and *Burke, supra,* dispel any illusions of the firms competence in the bankruptcy arena.

Mr. Berry testified that the results were unsatisfactory, despite some occasional output of capable "work product." The problem in the instant case is that at every strategic point the Arens firm miscalculated badly. Arens prevented any discussion of conversion to Chapter 7 with the debtors. A Chapter 12 was prepared but not filed for Ms. Prudhomme. House stipulated to the confirmation of FCB's plan in her case.

FCB describes the most flagrant example of the firms' incompetence as follows:

"Apparently ignorant of the most basic principles of bankruptcy law and of the rules of practice before this Court, the Arens Firm scheduled a hearing on its motion to appoint an expert appraiser and its motion to evaluate the Bank's collateral on the same day. Of course, the expert's testimony would have been essential to the presentation of the Arens Firm's case at the valuation hearing. Belatedly realizing that it could not proceed with the valuation hearing until its expert had been appointed, the Arens Firm sought a continuance on the very eve of the hearing. This contravened the local rule that requires that such a request normally be made three days in advance. The Arens Firm displayed almost cartoonish ineptitude, and its bumbling wasted the time and effort of the attorneys and experts who appeared before the Court fully prepared to proceed with the valuation hearing."

FCB Memorandum, pp. 25–26.[10]

Another matter that should be addressed relates to the ethical responsibilities of counsel to the Court. The deficiencies in the disclosure of compensation have already been discussed. The Arens Firm consciously avoids disclosure. In addition, FCB cites *Merchants & Farmers Bank of Dumas, Arkansas v. Hill,* 122 B.R. 539 (E.D.Ark.1990). There, a member of the Arens & Alexander firm argued that the stay under § 362 should bar further prosecution of a counterclaim filed by the debtors in a state foreclosure action. Relying on circuit level authority, the Court rejected that theory and various other contentions. The Court further found that misrepresentations had been made to it by debtors attorneys.

In the instant case, a misrepresentation occurred. After the departure of Mr. House from the firm, Mr. Bell returned to this Court for the hearing on confirmation of FCB's plan in the Batten case. Mr. Bell, during a pre-trial conference, affirmatively represented to this Court and all Counsel present that he had personally fired Mr. House from the firm. In his deposition, Mr. Bell concedes this was an "over-statement." Deposition, Bell, 93:18.

In the final analysis, the egregious actions of the Arens Firm in extracting an outrageously large retainer constitutes precisely the type of overreaching and unfair dealings with distressed debtors that the rule of § 329 and F.R.B.P. 2017 were intended to address. It is abundantly clear, moreover, that there was not only inadequate disclosure but that the *modus operandi* of the Arens Firm was to avoid disclo-

---

10. The Court denied the Motion for Continuance. The valuation hearing was held. An appeal was filed to the District Court and this Court's ruling was affirmed. *See* Ruling, June 2, 1992.

sure at all costs. Given these circumstances compounded by the less than skilled representation, disgorgement can and will be ordered.

### V. Ultimate Responsibility

■ Having reached the conclusion that disgorgement is the appropriate remedy, these Reasons next address the issue of which attorney(s) should be ordered to respond and whether Mr. Bell and Mr. Alexander should be permitted to withdraw. We note in this regard that in its Memorandum FCB argues that disgorgement should be directed solely against John F. Arens. The United States Trustee is not specific in this regard, but notes at page 2, of its memorandum that Mr. Bell appeared to be in charge of the case at its earlier stages. The United States Trustee also notes the misrepresentation made by Mr. Bell relating to Mr. House. *See* page 114, *supra*. The objections by the U.S. Trustee to withdrawal by House and Bell are not predicated on an articulated request to deny the requested relief so that the movant could be subjected to disgorgement.

All of the attorneys associated with the firm have heretofore been permitted to withdraw, with the exceptions of Mr. Bell and Mr. Alexander. Bell's duties as case administrator appear to have consisted of simply, in popular parlance, "putting out fires." Mr. Bell did indeed permit the Court and parties to labor under the false impression that he was in charge of the cases in their earlier stages. He did indeed overstate his role regarding the departure of Mr. House from the firm. For these transgressions, he should be and is hereby reprimanded. But to compel him to disgorge, when he appears to be merely a player and not the ultimate *protagonist*, would be unjust. The motion to withdraw filed by Eldered N. Bell will be granted and FCB's opposition thereto overruled.

Mr. Alexander's efforts in this case were limited at best. The signature on the motion to enroll is not his. Mr. Dara's signatures on various documents were ill-advised at best; but do not constitute offenses for which he should be sanctioned.

This Court concludes that the order of disgorgement should be limited to Arens. The evidence is overwhelming that it was John Arens, not the salaried attorneys, who managed (or rather mis-managed) this firm. It was Arens that deterred Zelinski from exploring a conversion option with Debtors. It was Arens who executed the contract regarding representation. It was Arens who allowed Mr. House to represent debtors knowing of his lack of expertise. There is no reason why the doctrine of *respondeat superior* should not apply here. Arens is the acknowledged leader of this cadre of supposedly trained professionals. It is all the more tragic that, under his leadership, rather than appearing as a well-orchestrated band, the players ultimately resembled the Keystone Cops.

### VI. Amount to be Disgorged

■ These Reasons have heretofore determined that disgorgement is the appropriate sanction. All amounts totalling $75,000 must be disgorged. FCB maintains, however, that double disgorgement is required. The thrust of this argument is that the conduct of the Arens firm in these cases is so "... outrageous [that] a bankruptcy court's inherent and/or statutory powers may be used to award amounts *in excess* of the actual out-of-pocket expenses of the injured party." FCB Memorandum, p. 32. Further, FCB asserts that it should be reimbursed costs and attorneys fees in connection with its efforts.

FCB notes in its memorandum the unresolved issue of the actual contempt power of the bankruptcy courts. *Compare Matter of Hipp, Inc.*, 895 F.2d 1503 (5th Cir. 1990) *with Matter of Case*, 937 F.2d 1014 (5th Cir.1991). However, here, its argument is rested on the power of a tribunal to control attorneys, and the inherent powers of the Court, *citing, inter alia, Chambers v. Nasco, Inc.*, 501 U.S. ——, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

FCB's argument is not without strong appeal, given the facts at bar. This Court resists the temptation based on lack of notice since FCB's original pleadings con-

tain no express prayer for double disgorgement.

█ In support of FCB's request for an award in excess of the actual out-of-pocket expense of the injured party, FCB cites *In re Braun,* 141 B.R. 133 (Bankr.N.D.Ohio), *amendment denied,* 141 B.R. 144 (Bankr. N.D.Ohio 1992), where the court ordered a payment of $15,000.00 above an aggrieved party's actual costs and attorney fees. FCB also cited *In re Shuma,* 124 B.R. 668 (Bankr.W.D.Pa.1991).

This Court similarly resists this intriguing suggestion. First, notice is deficient. Second, FCB has offered no evidence of any direct pecuniary loss it suffered.

### CONCLUSION

Arens masquerades as the champion of the downtrodden farmers, waging a successful battle against the forces of evil. The truth is that Arens lines his own pockets at the expense of his clients, the debtors' estates (and at least in the *Burke* case, at the expense of helpless animals). The attorneys acting on behalf of the firm intentionally mislead and misinformed the Courts of the nature of the professional relationship they enjoy with the client. The same attorneys repeatedly fail to perform competent services. This charade must end before another tragedy befalls an Arens client.

An order of disgorgement will be entered herein against John F. Arens compelling him to pay the sum of $75,000.00 to Mr. Al Boughton, the Trustee under the confirmed plans of the Farm Credit Bank, forthwith. For the reasons previously set forth, the Motion to Withdraw filed by Eldered N. Bell will be granted and the opposition of FCB overruled. The Motion to Strike FCB's Memorandum filed by John Arens is denied. The Motion to Withdraw filed by Mr. Alexander is granted in the Prudhomme case; permission having already been granted in the Batten case. The United States Trustee's objection to Mr. Alexander's Motion is over-ruled. FCB's Motion to Strike the Affidavits and Purported

Summary of Bankruptcy Accounting submitted by the Arens Law Firm is granted. Separate, conforming orders will enter.

### EXHIBIT

ARENS LAW FIRM

*Attorneys at Law*

CENTER COURT SQUARE

31 EAST CENTER STREET

FAYETTEVILLE, ARKANSAS 72701

*Telephone* (501) 442–0584 *Telecopier* (501) 442–9397

October 21, 1992

Mr. & Mrs. John T. Batten

HC box 400

Natchez, LA 71456

Dear Mr. and Mrs. Batten:

This is the hardest letter I have ever written. I've postponed its drafting in hopes of a breakthrough or a miracle of some sort. It is with the greatest sorrow that I write concerning recent events at the Arens Law Firm.

During the past several weeks, I have been forced to accept resignations from my entire staff of attorneys, and have not even been able to return your phone calls. I must now reluctantly recommend that you must immediately seek alternate legal representation. I have contacted this firm's former attorneys, asking them to continue your cases until they are completed, or at least until other counsel can be found.

Since the founding of Arens & Alexander, we grew to become the largest and strongest agricultural law firm in this country. From coast to coast we have waged fierce battles on behalf of farmers, ranchers and others. Our adversaries possess immense financial and political influence and include the Chicago Board of Trade, the Farm Credit System, the Farmer's Home Administration, the Environmental Protection Agency, major insurance companies and banks. Our reputation during these years as a firm that would not

quit its clients invoked caution by our adversaries. As an example, a Farm Credit System memo notified their branches to: "Avoid litigation with Arens & Alexander at all costs."

Because of the extreme stress and financial burdens of representing distressed farm families, many of our attorneys over the years left the firm and had to be replaced, which cost additional time and expense. In May 1991 we hired a new attorney, purportedly an experienced litigator and case manager. Within several months he was meeting the expectations of Richard Alexander and me. In August 1991, after Mr. Alexander stepped aside because of personal reasons, this new attorney became managing attorney in charge of all cases at the firm and supervisor of our attorneys.

Shortly thereafter I received a report from one of our clients who told me she had information based on the reliable reports of others that our new managing attorney was placed in our firm to destroy it. At the time, I discounted her assertion because he appeared to me to be sincere in his commitment to our firm and to our clients. I now wish that I had taken her warning more seriously.

I have since learned that he undermined the spirit of our firm and the confidence of our staff in your cases. Furthermore, he secretly encouraged the resignation of many of our attorneys. Six weeks ago, he and the remaining senior attorneys resigned. Despite the firm's requirement that all attorneys give sufficient notice to avoid injury to our clients, and with the certain knowledge that it would destroy the firm, he gave absolutely no advance notice of his resignation. Within a few weeks, though every effort was made to proceed effectively with your cases, fear prompted all the remaining junior attorneys, except for my brother, Richard, to also resign.

Unless our former case manager was just incompetent, his conduct, including the way he handled your cases, and the negative reports I have since received from many of you, leads me to believe that his actions were an intentional effort to ruin our firm and benefit our adversaries. Since I am the one ultimately responsible to you, I will not rest until we know the truth, and who, if anyone, was behind his actions.

With more than 200 pending client matters, and the departure of our attorneys, my ability to directly represent you has been severely crippled. However, I will make myself available to consult with you and your new legal counsel to facilitate this necessary transition. All documents and other items in my possession that belong to you will be returned promptly upon your request.

My personal and professional costs over the years have been tremendous. My license to practice law has been threatened. Virtually all of my assets have been depleted in fighting for your cause and I am now deeply in debt. Our opponents undoubtedly feel that they have defeated you by destroying this firm and bankrupting me. While they may succeed in closing the Arens Law Firm, they have not necessarily defeated you. I implore you to obtain the services of your former attorney at this firm, or other legal counsel as soon as possible so that you can continue your fight against your adversaries.

As time and resources permit, I will continue to fight for you and the issues that are important to American farmers and ranchers because I believe that the wealth and well-being of this country depends on your wealth and well-being. Even with all the apparent difficulties, I must say that our struggle has not been completely in vain. Together with other farm advocates, we have brought many of the problems facing the American farmers and ranchers to the attention of our country's leading decision-makers, as well as ordinary citizens. We have participated in the development of lender liability law to protect borrowers from the unscrupulous and unconscionable behavior of lenders. Most important of all, I drafted the "Hunger Relief Act," which was introduced last year in Congress. The act is intended to provide parity price to all farmers and to feed the hungry.

I believe that God guides our path and that we will prevail. With my deepest hope and love, I remain your friend.

Sincerely yours,
/s/ John F. Arens
John F. Arens